CLERK'S OFFICE U.S. DISTRICT COURT
AT ABINGDON, VA
FILED

July 17, 2024
LAURA A. AUSTIN, CLERK
BY /s/ Kendra Campbell
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | |
|---|---|
| DENTAVIA MCNAIR, | Case No.  1:24cv30 |
| *Plaintiff,* | |
| v. | **JURY TRIAL DEMANDED** |
| UNITED STATES OF AMERICA | |
| and | |
| J.C. STREEVAL<br>Former Warden<br>United States Penitentiary, Lee<br>Lee County Industrial Park<br>Hickory Flats Road<br>Pennington Gap, VA 24277 | |
| and | |
| JAMES BOWLES<br>Captain<br>United States Penitentiary, Lee<br>Lee County Industrial Park<br>Hickory Flats Road<br>Pennington Gap, VA 24277 | |
| and | |
| MATTHEW M. GILMER<br>Officer<br>United States Penitentiary, Lee<br>Lee County Industrial Park<br>Hickory Flats Road<br>Pennington Gap, VA 24277 | |

i

and

OFFICER SMITH
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

JUSTIN D. SMALLWOOD
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

BRANDON H. GAYHEART
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

MATTHEW GLASS
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

ii

and

MICHAEL CHAD HAMILTON
Lieutenant
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

DR. JOSE CAPRILES-MERCADO, PsyD
Psychology Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

SAREENA SCOTT, R. N.
Health Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

LEON CAUDILL, R. N.
Health Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

KAELA BAKER, R. N.
Health Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

DOE DEFENDANTS 1–5,
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

*Defendants.*

## COMPLAINT

Plaintiff Dentavia McNair ("Plaintiff" or "Mr. McNair"), through undersigned counsel,
files this Complaint against Defendants United States of America, J.C. Streeval, James Bowles,
Bradley Parsons, Matthew M. Gilmer, Officer Smith, Justin D. Smallwood, Brandon H. Gayheart,
Matthew Glass, Michael Chad Hamilton, Dr. Jose Capriles-Mercado, Sareena Scott, R.N., Leon
Caudill, R.N., Kaela Baker, R.N., and Doe Defendants 1–5, (collectively "Defendants"; without
the United States, "Individual Defendants"). Plaintiff seeks damages for injuries he suffered as a
result of Defendants' deliberate indifference toward, and breach of their duties to protect
Mr. McNair's safety. Plaintiff hereby alleges, based on his personal knowledge, information, and
belief, as follows.

## NATURE OF ACTION

1. "Being violently assaulted in prison is simply not 'part of the penalty that criminal
offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)
(citations omitted). Moreover, under the Eighth Amendment, prisoners must have "the minimal

1

civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), including "basic human needs," such as food, sanitation, and medical care. *Id.*

2. Mr. McNair, a former resident in United States Penitentiary at Lee ("USP Lee") at all times relevant to this Complaint, is among the hundreds of residents who have been routinely subjected to unwarranted and excessive physical assaults, racial discrimination, and depravation of basic human needs in violation of the United States Constitution. Mr. McNair's tormentors are the Warden, guards, and other staff at USP Lee who are charged with protecting Mr. McNair's rights, ensuring his safety, and providing for his basic human needs. These Defendants intentionally betray—spectacularly—these basic obligations to Mr. McNair and the other residents at USP Lee. At USP Lee, residents are not only serving time, but they are also being physically and mentally destroyed by the individuals tasked with carrying out their sentences.

3. Mr. McNair understands that, as an individual serving time in a federal penitentiary, his civil rights are subject to constraints that do not exist outside of a penitentiary. But certain fundamental constitutional rights remain, even for a person convicted of a felony such as Mr. McNair. And a torture chamber sanctioned by the federal government in which Defendants assault residents like Mr. McNair; a prison administration in which almost-exclusively-white guards discriminate against and commit violent criminal acts disproportionately against persons of color; a prison in which the Defendants enlist and threaten residents to "put in work" by committing violent physical acts against other residents; a prison staff that dehumanizes residents by parading them nearly nude through the facility while mocking their race and genitalia (and in some instances sexually assaulting residents along the way); depriving residents of food, sanitary living conditions, and basic medical care; and employing violence and restraints for periods lasting several days in contravention of codified prison policies—none of this comes even close to

meeting the lowest possible standards for resident care at a federal penitentiary.

4.     To make matters worse, the Defendants have engaged in a coordinated effort to silence complaints by residents, such as Mr. McNair, by depriving them of their limited redress for these egregiously horrifying conditions.  Defendants do so by withholding the forms residents use to lodge grievances for misconduct by prison staff and refusing to submit completed grievance forms in the required timeframes. Defendants go as far as intimidating and retaliating against residents, like Mr. McNair, who pursue legitimate administrative grievances against prison staff for abuse, including by isolating prisoners in the Special Housing Unit ("SHU") without justification or based on false premises; interfering with communications between prisoners and their counsel and; opening and reading clearly marked privileged legal mail communications. Prisoners who dare to speak out against staff abuse are moved to other facilities.  As a practical matter, the limited rights prisoners have to pursue lawsuits for abuse pursuant to the Prison Litigation Reform Act are systematically thwarted by the administration at USP Lee through the means described above.  As a result, it is virtually impossible for a resident who has suffered abuse, such as Mr. McNair, to navigate a complex multi-step grievance process in order to exhaust his administrative remedies under 42 U.S.C. § 1997e(a) and then bring a civil lawsuit.

### JURISDICTION AND VENUE

5.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 171 and 28 U.S.C. § 1346(b) because Mr. McNair's claims present federal questions regarding rights arising under the Constitution and laws of the United States, as well as claims alleging negligent and other wrongful acts by employees of the federal government.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because one or more of Defendants reside in this judicial district, and all or a substantial amount of the events, acts or omissions giving rise to Plaintiff's claims occurred, in whole or in part, in Pennington Gap,

3

Virginia, in the Western District of Virginia.

## PARTIES

A.    Plaintiff.

7.    Plaintiff Dentavia McNair (Mr. McNair") is a 35-year-old man who, at all times relevant to this Complaint, was a resident at USP Lee.  Prior to his conviction, Mr. McNair resided in and was a citizen of the State of Georgia.  Mr. McNair arrived at USP Lee on or around July 11, 2023, and he has since been a victim of a brutal assault by USP Lee officers while in ambulatory restraints.  Mr. McNair currently resides at USP Hazleton.

B.    Defendants.

8.    Defendant United States of America ("United States") created and oversees the BOP, a federal law enforcement agency within the U.S. Department of Justice that operates U.S. federal prisons and is responsible for the care, custody, and control of individuals who reside at these facilities. The United States employs all BOP correctional officers, guards, and staff named as Defendants in this action. At all times relevant herein, the individual Defendants in this action were acting as agents of the United States.

9.    Defendant J.C. Streeval ("Defendant Streeval")[1] is the former Warden of USP Lee, and he served as Warden during the entire time Mr. McNair was incarcerated at USP Lee.  He was responsible for overseeing the operations at USP Lee, including resident housing decisions, the use of force, the use of restraints, and the administration and provision of medical care to residents.

---

[1] Warden Streeval arrived at USP Lee in 2020. Since then, he has been named as a defendant in eighteen other actions in the U.S. District Court for the Western District of Virginia. In these actions, plaintiffs allege Warden Streeval has engaged in acts, through his work at USP Lee, relating to: failure to protect residents, torture, assault, sexual harassment, unreasonable searches and seizures, violations of due process rights, violations of equal protection rights, derelictions of duty, negligence leading to assault and death, deliberate indifference to prisoners' lives, retaliation against prisoners, abuse of power and authority, failure to follow CDC guidelines, cruel and unusual punishment, reckless disregard for life, provision of unlawful living conditions, denial of medical treatment to prisoners, unlawful imprisonment, denial of prisoner access to legal materials, mail tampering, retaliatory excessive force, falsifying official prison reports, excessive force, failing to provide access to legal remedies, and entrapment.

4

He is sued here in his individual capacity. Upon information and belief, Defendant Streeval resides in Tennessee and worked in the Commonwealth of Virginia.

10. Defendant James Bowles ("Defendant Bowles") is the Captain of USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Bowles resides and works in the Commonwealth of Virginia.

11. Defendant Bradley Parsons ("Defendant Parsons") is a Lieutenant Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Parsons resides and works in the Commonwealth of Virginia.

12. Defendant Matthew M. Gilmer ("Defendant Gilmer") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Gilmer resides and works in the Commonwealth of Virginia.

13. Defendant Officer Smith ("Defendant Smith") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Smith resides in and works in the Commonwealth of Virginia.

14. Defendant Justin D. Smallwood ("Defendant Smallwood") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Smallwood resides and works in the Commonwealth of Virginia.

15. Defendant Brandon H. Gayheart ("Defendant Gayheart") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Gayheart resides in the state of Tennessee and works in the Commonwealth of Virginia.

16. Defendant Matthew Glass ("Defendant Glass") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Glass resides and works in the Commonwealth of Virginia.

17.    Defendant Michael Chad Hamilton ("Defendant Hamilton") is a Lieutenant at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Hamilton resides and works in the Commonwealth of Virginia.

18.    Defendant Dr. Jose Capriles-Mercado ("Defendant Capriles-Mercado") is a physician formerly employed at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Capriles-Mercado resides and works in the state of Florida.

19.    Defendant Nurse Sareena Scott ("Defendant Scott") is a nurse at USP Lee.  She is sued here in her individual capacity.  Upon information and belief, Defendant Scott resides and works in the Commonwealth of Virginia.

20.    Defendant Nurse Leon Caudill ("Defendant Caudill") is a nurse at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Caudill resides in the state of Kentucky and works in the Commonwealth of Virginia.

21.    Defendant Nurse Kaela Baker ("Defendant Baker") is a nurse at USP Lee.  She is sued here in her individual capacity.  Upon information and belief, Defendant Baker resides and works in the Commonwealth of Virginia.

22.    Doe Defendant 1 is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Doe Defendant 1 resides and works in the Commonwealth of Virginia.

23.    Doe Defendant 2 is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Doe Defendant 2 resides and works in the Commonwealth of Virginia.

24.    Doe Defendant 3 is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Doe Defendant 3 resides and works in the

6

Commonwealth of Virginia.

25.    Doe Defendant 4 is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Doe Defendant 4 resides and works in the Commonwealth of Virginia.

26.    Doe Defendant 5 is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Doe Defendant 5 resides and works in the Commonwealth of Virginia.

### FACTS

27.    USP Lee is a federal penitentiary located in Pennington Gap, Virginia.

28.    USP Lee is a high-security facility that houses approximately 1,500 adult males who are high security offenders.[2]  USP Lee has twelve housing units located in three buildings. Each housing unit can house 128 offenders.[3]

29.    USP Lee has one SHU.  The purported purpose of the SHU is to 1) house residents in disciplinary segregation as a result of a formal disciplinary finding; 2) house residents on administrative detention pending transfer or investigation of a disciplinary infraction; and 3) house residents in protective custody.[4]

30.    In reality, the SHU, which is routinely kept at full capacity by USP Lee's administration, is used as a venue for extreme abuse and retaliation against residents by prison staff.  Indeed, individuals housed in the SHU often hear the screams of other residents as they are tortured by prison staff around the clock, typically within the two holding cells located in the SHU.

---

[2] Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.
[3] *USP Lee*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/lee/.
[4] *Program Statement on Special Housing Units*, Federal Bureau of Prisons at 3–6; 9 (Nov. 23, 2016), https://www.bop.gov/policy/progstat/5270.11.pdf.

These holding cells do not have toilets, and individuals who are abused in those cells, often over the course of consecutive days, are forced to defecate and urinate on themselves.

31.    The prison staff, including the Defendants, strategically conceal their abuse, and will often place toilet paper over the cameras in the SHU holding cells, which do not capture sound, to prevent their actions from being recorded.  In other instances, residents are taken by prison staff to blind spots in the SHU and passages leading to and from it, where cameras cannot record the abuse that occurs.  In still other instances, prison staff will threaten an individual to violently attack his cellmate within their own cell, where cameras are also not located.

32.    To further conceal the abuse of prisoners, residents are forced, under the threat of additional violence, to state in a video recording captured by medical personnel that they do not have any injuries.

33.    The SHU contains a medical examination room that is rarely, if ever, used to conduct actual medical evaluations.  The medical staff tasked with providing care in the SHU are complicit with the abuse and torture that take place, and the severe injuries that result.  USP Lee medical staff are often complicit in the efforts of other prison staff to conceal injuries by ignoring injuries to residents and/or by falsifying medical reports.  Indeed, medical staff are often present in the cell while residents are being repeatedly kicked, punched, and tortured by prison staff, but they nevertheless report that victims have suffered no injuries.

34.    The conditions of confinement in the SHU are inhumane.  Individuals are not provided proper or clean clothing and are sometimes forced by prison staff to wear paper gowns that expose their genitalia—leading to sexually and racially abusive commentary, and at times sexual abuse, by prison staff.  When prisoners are given SHU uniforms, they are often forced to wear the same tattered, dirty clothing for several days in a row.  Individuals are given a total of

8

10–12 squares of toilet paper per day, if they are given any toilet paper at all. The toilets malfunction regularly, and individuals are forced to leave their feces in towels until maintenance staff arrives, which sometimes takes several days. Individuals are forced to eat bologna sandwiches after prison staff smear them across a dirty floor. In some cases, food is withheld from residents altogether for days on end. Recreation time is inconsistent and generally nonexistent. Windows in the SHU are sandblasted which prevents any natural light from entering cells, leaving residents to receive small slivers of sunlight through tiny cracks in the sandblast.

35.    Access to the law library in the SHU is non-existent due to prison staff routinely reporting that the law library computers are broken or inaccessible. Residents are rarely even given a copy of the Bible.

36.    Residents suffering from these horrible conditions and treatment are given only limited access to grievance forms to lodge complaints against USP Lee staff. USP Lee officers will not only refuse to give the grievance forms to individuals who request them, but when they do, will also at times provide the wrong form, and/or fail to transmit completed grievance forms to the appropriate personnel in the required timeframes. Indeed, USP Lee officers threaten individuals who attempt to access administrative grievances with more, and more severe, violence.

37.    Although the SHU is generally reserved for individuals who either pose a threat to other residents, staff, or are at risk of harm, USP Lee staff confine individuals like Mr. McNair in the SHU for no legitimate reason. Residents are remanded to the SHU (which is almost always fully occupied) so that prison staff can take advantage of seemingly vulnerable residents, and/or as a retaliation for an individual's complaints regarding the unconstitutional conditions at USP Lee and/or requests for medical and mental health care.

38.    When all of the cells in the SHU are full and prison staff want to transfer an

individual in a particular unit to the SHU, the resident's particular unit is placed on "lockdown." When a unit is on lockdown, individuals in that unit do not receive hot meals, are not permitted to shower regularly, do not receive clean clothing, do not receive phone calls or visits from family, and cannot access the prison's programming or the law library.

39.    The almost-exclusively-white prison staff at USP Lee discriminates against residents of color by disproportionately targeting them for physical violence, other forms of abuse, depriving them of medical attention and other basic rights, and housing them in the SHU.  Prison staff also regularly, consistently and openly use vulgar racial epithets to refer to Black and Hispanic residents.  As is the case with Mr. McNair, Defendants take pride in their culture of violence against Black and Hispanic residents by gruesomely pulling out and hanging residents' hair on display on the penitentiary's fences.

40.    Prison staff often force residents to "put in work" by fighting each other, targeting certain residents for violence.  USP Lee officers purposefully pair individuals who pose a safety threat to each other in the same cell—creating dissonance between them by sharing otherwise protected information about the individual's prior conviction or disseminating lies about the same based on prior disciplinary infractions.  USP Lee officers will alert one cellmate that the other is a child molester, referring to the offending resident as a "cho mo," and then demand that his non-offending cellmate beat the one labeled as a "cho mo."  USP Lee officers threaten to physically assault and abuse any cellmates who do not comply.  Because if they fight each other, then they can control the nature of the violence; most cellmates agree to fight rather than risk assault by the USP Lee officers.

41.    The culture of inhumane violence and abuse at USP Lee, experienced first-hand by Mr. McNair, has been previously documented at length.  In a September 6, 2019 "Follow-Up

10

Inspection Report,"[5] investigators at the District of Columbia Corrections Information Council (the "CIC")[6] reported a litany of unconstitutional and sub-standard practices, including the following:

- Many residents expressed the expectation that they would face some form of retaliation for their participation in CIC interviews, from physical assaults by staff, to loss of facility jobs, to having their mail held for an excessive period.[7]

- Individuals reported being left in four-point restraints for 12 to 13 hours and more than 16 hours without access to toilets.[8]

- Several individuals mentioned a regular practice in which residents were assaulted, restrained, put in a paper gown, and forced to walk backwards in view of other residents.[9]

- One resident was slammed to the ground by an officer and then tied to a chair and left in an office for an hour before being transported to the SHU.[10]

- Residents said that staff beat residents with apples in socks or through a shield to prevent leaving marks of the assault.

- Individuals reported sexual assault or sexual harassment by staff, including seeing an officer grab a resident's testicles.

---

[5] *See generally* Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.

[6] The District of Columbia does not maintain its own prison system. Instead, individuals sentenced for felony offenses under the D.C. Code are transferred to the Federal Bureau of Prisons. The CIC is an independent oversight entity maintained by the U.S. Congress and the Council of the District of Columbia to inspect, monitor and report on conditions of confinement at all facilities, including federal facilities, where D.C. Code offenders are housed.

[7] *Id.* at 8, I.

[8] *Id.* at 8, II.

[9] *Id.*

[10] *Id.*

11

- One resident reported that a lieutenant put a shield on the resident's chest, and kneeled on it while the resident was on his back and shackled.[11]

- Prison staff regularly use racial slurs.[12]

- During cell shakedowns, officers routinely sweep residents' belongings into the trash, including clothes, food, and hygiene products purchased off commissary, and fail to provide documentation of the confiscation of their property.[13]

- The USP Lee staff undermine or outright foreclose residents from pursuing the Bureau of Prisons Grievance Process.  Residents have complained of being told by Warden Streeval that grievances would "never make it out of the SHU."[14]  Other prison staff have told residents that their complaints will never go anywhere "because the Warden will lie for his staff."[15]

- Officers and USP Lee leadership have refused to separate cellmates who requested separation due to interpersonal conflict and the inherent safety risks caused by the conflicts, and have told residents to fight or stab each other.[16]

- Residents are not provided adequate medical care.[17]

- Residents have been forced to clean up raw sewage flooding into the cells without adequate protection.[18]

- USP Lee was on lockdown for most of 2018 because the SHU was operating at or

---

[11] *Id.*
[12] *Id.* at 8, IV.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.* at 11, V.
[18] *Id.* at 12, VI.

12

near capacity.[19]

42.     As described further below, nothing has changed at USP Lee since the CIC report was issued.  The injuries sustained by Mr. McNair in 2023 and the unconstitutional practices that continue to be the norm at USP Lee are just the latest in a history of abuse that goes back many years.

**BOP Guidelines on Use of Force**

43.     The injuries sustained by Mr. McNair arose, in part, from practices that are expressly forbidden under the policies and regulations that govern staff conduct at USP Lee.

44.     The BOP strictly limits the use of force, including the placement of residents in restraints, as a last alternative after all other reasonable efforts to control a resident or situation have failed.[20]  When authorized, staff must use only that amount of force necessary to gain control of the resident, to protect and ensure the safety of residents, to prevent serious property damage, and to ensure institutional security and good order.[21]

45.     Prison staff may only use physical restraints if it is necessary to gain control of a resident who appears to be dangerous because the resident:  (a) assaults another individual; (b) destroys government property; (c) attempts suicide; (d) inflicts injury upon self; or (e) becomes violent or displays signs of imminent violence.[22]

46.     Under no circumstances may physical restraints be employed to punish residents.[23]

47.     BOP regulations further state that prison staff may temporarily apply physical restraints when one of the above requirements is met; however, the Warden or designee must

---

[19] *Id.* at 9, III.
[20] *Program Statement on Use of Force and Application of Restraints*, Federal Bureau of Prisons ¶ 5 (Nov. 30, 2005), https://www.bop.gov/policy/progstat/5566_006.pdf.
[21] *Id.* ¶ 6(c).
[22] *Id.* ¶ 1.
[23] *Id.* ¶ 6(h)(1).

decide whether the use of physical restraints should continue.[24]  If physical restraints are used, BOP policy mandates that the least restrictive restraint method be used that is necessary for the situation.[25]  Specifically, "ambulatory restraints" (i.e., handcuffs, leg irons, and a belly chain) should initially be used if possible, and "four-point restraints" (i.e., chaining a resident to a bed at his wrists and ankles) should be used if they are the only means available to obtain and maintain control over a resident.[26]

48.     Under BOP policy, all "use of force incidents must be reported and investigated . . . to eliminate the unwarranted use of force."[27]  In addition, prison staff must report the use of force directly to the Assistant Director, Correctional Programs Division; Assistant Director, Health Services Division; Central Office Correctional Services Administrator; Regional Director; and the Regional Correctional Administrator.[28]  These reporting protocols ensure that BOP management, from prison staff to the Warden to the Regional Director of the BOP, participates in the decision-making and monitoring process in the use of force, and that prison staff do not inappropriately use force on residents.

49.     As discussed further below, virtually none of these BOP regulations were complied with in using restraints on Mr. McNair.

### Defendants' Assault and Torture of Mr. McNair

50.     Mr. McNair arrived at USP Lee on or around July 11, 2023.

51.     Upon arrival, Mr. McNair was processed through the Receiving and Delivery ("R&D") Department which handles the in-take of new residents.[29]  Mr. McNair was designated

---

[24] *Id.* ¶ 6(d).
[25] *Id.* ¶ 9.
[26] *Id.* ¶ 10.
[27] *Id.* ¶ 6(j).
[28] *Id.* ¶ 14(a)(1)–(5).
[29] *Program Statement on Receiving and Discharging Manual*, Federal Bureau of Prisons at 10 (Aug. 12, 2014), https://www.bop.gov/policy/progstat/5800_018.pdf.

and housed on the compound as part of the general population at USP Lee.

52.     Approximately three weeks later, on the morning of September 4, 2023, Mr. McNair was participating in outdoor recreation before lunchtime.  While on the yard, Mr. McNair was told by other USP residents that he needed to attack a particular resident before that resident attacked Mr. McNair.  Wanting to stay out of trouble and maintain a clear record at USP Lee, Mr. McNair refused to attack the other resident. But, he was concerned about his well-being.  To protect himself and in conformance with the rules at USP Lee, Mr. McNair sought to disclose his concerns and seek assistance from USP Lee staff.

53.     When Mr. McNair arrived at the Lieutenant's office around 9:30 a.m. on September 4, 2023 to seek this assistance, Defendant Bowles, Defendant Parsons, Defendant Gayheart, Doe Defendant 1, and Doe Defendant 2 (collectively "Lieutenant's Office Defendants") were present. Mr. McNair began explaining to the Lieutenant's Office Defendants that he was concerned for his safety and requested to be placed in protective custody.

54.     In response, the Lieutenant's Office Defendants disregarded Mr. McNair's fears, saying, "there are no scratches on you, we want to see blood."  Mr. McNair again explained that he was trying not to get hurt or cause problems; that he wanted to be able to go home at the end of his time in a few months; and that he feared for his safety.  The Lieutenant's Office Defendants replied, "we don't care," and urged Mr. McNair to sign a form that, upon information and belief, was used by USP Lee staff to incriminate other residents.  Mr. McNair believed that signing the form would put him in further danger as it would label him as a "snitch." Accordingly, Mr. McNair refused to sign the form.

55.     Defendant Bowles then called Mr. McNair a "scared motherfucker" and urged him to "go bust somebody and come back" later.  Defendant Parsons also called Mr. McNair a "pussy"

15

and a "bitch" while the other Lieutenant's Office Defendants insulted him with racial slurs.

56.     When the Lieutenant's Office Defendants further pressed Mr. McNair to provide the names of the individuals he was concerned about in writing, Mr. McNair voiced concerns about providing this information, gesturing with his hands while doing so.  In response, a Doe Defendant shouted, "he [(McNair)] swung at him [(a different officer)]," even though Mr. McNair was only using hand gestures as he spoke and was in no way acting aggressively.  At no point did Mr. McNair make contact with, or attempt to make contact with, any of the Lieutenant's Office Defendants.  At that point, a USP Lee officer pressed a button to sound an emergency alarm.

57.     After the emergency alarm was pressed, Defendant Gayheart tackled Mr. McNair to the ground where he, Doe Defendant 1, and Doe Defendant 2 began to kick and punch Mr. McNair's body as he lay on the floor, yelling at him to "stop resisting."  Mr. McNair remained motionless as he was being assaulted and exclaimed back that he was not resisting.  During this time, other Unknown officers gathered outside the Lieutenant's Office in response to the sounding of the emergency alarm.

58.     The assault subsided for a moment and Mr. McNair was pinned to the ground. While Mr. McNair was on the ground, Defendant Gayheart cut Mr. McNair's clothing from his legs to his torso, and placed him into paper clothing, including a paper gown, paper thong, and paper pants, and a helmet.

59.     Defendant Gayheart, Doe Defendant 1, and Doe Defendant 2 put Mr. McNair into black box ambulatory restraints.  While applying the waist restraint, Defendant Gayheart told Mr. McNair that "we are going to give you the Lee County mark."  The restraints were excessively tight and dug into Mr. McNair's wrists, stomach, and ankles.  Defendant Gayheart then proceeded to cut one of Mr. McNair's dreadlocks with the same pair of scissors he used to remove his

16

clothing. Mr. McNair was confused and overwhelmed with fear for his well-being; he was not resisting or fighting any of the Defendants in any manner.

60. Defendant Bowles and Defendant Parsons observed this assault on Mr. McNair. Neither intervened nor instructed their subordinates to stop their abuse of Mr. McNair.

61. While Mr. McNair was in the Lieutenant's Office, Defendant Capriles-Mercado came into the Lieutenant's office to "evaluate" Mr. McNair. Without asking Mr. McNair any questions or conducting any assessment, despite Mr. McNair's obvious distress in having just been beaten by certain Defendants, Defendant Capriles-Mercado stated that Mr. McNair "looked fine" to him and proceeded to exit the office. Defendant Capriles-Mercado did not perform any further evaluation of Mr. McNair after he left the Lieutenant's office.

62. After the ambulatory restraints were applied, Mr. McNair was strapped into a restraint chair and wheeled to the SHU by the Lieutenant's Office Defendants, joined also by Defendant Scott and approximately ten unknown officers who responded to the emergency alarm. While escorting Mr. McNair to the SHU—an approximately 3-minute-long journey—Defendant Parsons asked Mr. McNair whether Mr. McNair had any injuries to report while an unknown officer recorded this interaction with a camera. Fearful of further abuse, Mr. McNair reported that he had no injuries. During the recording, Defendant Scott, a medical provider at the facility, failed to evaluate or assess Mr. McNair or his restraints.

63. When Mr. McNair arrived in the SHU, Defendant Smith, Defendant Gilmer, and Defendant Smallwood pulled Mr. McNair from the restraint chair and placed him in a holding cell with a toilet and a suicide mat while Defendant Parsons (collectively "Shift 1 SHU Defendants"), the Lieutenant on duty in the SHU, observed. This room had no camera that captured the inside of the room. Instead, the lone camera only recorded who entered or exited the room.

17

64.     The Shift 1 SHU Defendants ordered Mr. McNair to remain kneeling while in the ambulatory restraints with his head positioned within the parameters of a black, spray-painted circle on the back wall any time staff entered the cell.  If staff were not present in the cell, he was ordered to remain standing in a corner.

65.     Every two hours, certain Defendants entered the holding cell to perform "restraint checks."  However, as explained below, instead of checking Mr. McNair's restraints, certain Defendants repeatedly attacked Mr. McNair with no justification.

66.     The first of these restraint checks began with Defendant Gilmer, Defendant Smith, and Defendant Smallwood, who was holding a riot shield, rushing into the cell and slamming Mr. McNair against the wall, while pressing the shield into Mr. McNair's back and simultaneously, into the backs of his knees and feet.  These Defendants then took turns punching Mr. McNair in his face and kicking his entire body while calling Mr. McNair a "fucking pussy" and a "nigger."  The Defendants also attempted to punch and kick Mr. McNair in his groin area.  Defendant Parsons was present and observed these attacks perpetrated by the other Shift 1 SHU Defendants.  During this first "restraint check," Defendant Smith cut off another one of Mr. McNair's dreadlocks, stating that the next time he would "cut [his] nuts off."

67.     During this first restraint check, Defendant Smith also announced, "Let me show you a new trick we learned," and then karate-chopped Mr. McNair's throat ten times.

68.     Defendant Smith chopped Mr. McNair's neck this way during each of the subsequent "restraint checks" performed by the Shift 1 SHU Defendants.

69.     During each of these aforementioned assaults, the Shift 1 SHU Defendants made sexually abusive comments to Mr. McNair.  Defendant Smith told Mr. McNair to "call the Lieutenant 'daddy'" and threatened, "I'm going to cut your dick off."  Additionally, Defendant

18

Parsons told Mr. McNair, "I'm going to go home and jerk off to you tonight."

70.     When the Shift 1 SHU Defendants' shifts ended in the mid-afternoon of September 4, 2023, Defendant Hamilton, took over as the Lieutenant on duty in the SHU, and Defendant Glass, Doe Defendant 3, Doe Defendant 4, and Doe Defendant 5 (collectively "Shift 2 SHU Defendants") started their shifts.  Like the Shift 1 SHU Defendants, the Shift 2 SHU Defendants continued to rush into the holding cell every two hours, pinning Mr. McNair's head and body against the wall, and also pressing the shield down into the back of his knees, while punching and kicking him throughout his body.

71.     Although Defendant Hamilton observed the torture of Mr. McNair during his shift, Defendant Hamilton neither intervened nor instructed his subordinates to stop their abuse of Mr. McNair.

72.     Periodically, during these instances of torture by both the Shift 1 Defendants and the Shift 2 SHU Defendants, Defendant Scott would enter the room and observe the abuse of Mr. McNair and perform a perfunctory restraint check.

73.     After watching the officers assault Mr. McNair during one of the restraint checks, Defendant Scott checked the restraints by placing a finger under Mr. McNair's wrist and ankle restraints, which were digging into Mr. McNair's skin.  However, Defendant Scott failed to examine the restraint on Mr. McNair's stomach, which also was digging into his skin and injuring him.

74.     During Defendant Scott's visits to his cell, Mr. McNair was forced to report on camera that he had no injuries.  Remarkably, Defendant Scott's medical reports taken at the second and third "restraint checks" indicate that Mr. McNair was in "no acute distress."  At no point during the assault did Defendant Scott intervene to stop the violence inflicted on Mr. McNair.  Defendant

19

Scott also failed to accurately document Mr. McNair's injuries and distress. She never asked Mr. McNair if he was hurt or provided any medical attention to his injuries.

75. Defendant Caudill, whose shift began after Defendant Scott's shift ended, issued a single report at 9:20 p.m. that stated he "repositioned" Mr. McNair's leg restraints. During this "repositioning" of Mr. McNair's restraints, Defendant Caudill verbally acknowledged that Mr. McNair's restraints were too tight. However, after the restraints were adjusted, they were still excessively tight. Thus, the "repositioning" of the restraints did not actually bring any relief to Mr. McNair's abuse.

76. Like Defendant Scott, Defendant Caudill was also present and observed the violence each time the Shift 2 SHU Defendants entered Mr. McNair's cell. Defendant Caudill never intervened to stop any of the assaults inflicted upon Mr. McNair and also failed to accurately document Mr. McNair's apparent injuries and distress.

77. When the Shift 2 SHU Defendants' shifts ended around 3:00 a.m. on September 5, 2023, a new group of officers and a new Lieutenant arrived to begin their shifts. When these Shift 3 officers first entered Mr. McNair's cell, the Shift 3 Lieutenant said, "McNair, you pissed someone off. I'm going to let you off at 3:45 if you don't give us trouble or piss off my officers."

78. Around 3:45 a.m. on September 5, 2023, the Shift 3 SHU officers released Mr. McNair from the ambulatory restraints, after approximately seventeen hours of abuse. When he was released, Mr. McNair could not stand up. Mr. McNair was barely able to stand hours later when breakfast was delivered to his holding cell.

79. As a result of Defendants' conduct, Mr. McNair suffered multiple severe injuries, including bruising and swelling to his right eye and neck; abrasions to his stomach, wrists, and ankles; bruising on his knees; soreness in his abdomen and neck; and a tingling sensation in his

20

left wrist that persists today. Furthermore, after he was released from his ambulatory restraints, Mr. McNair had to sleep for two or three days for his body to recover and could not shower during this time because the water burned his wounds. Mr. McNair was unable to talk or swallow normally for approximately a week due to the repeated hits to his neck. In addition, Mr. McNair was unable to work out for two weeks following the abuse he suffered, despite previously working out every day.

80.     In an effort to justify the injuries sustained in the SHU, approximately a week after the assault, Mr. McNair was issued an incident report for an alleged "assault on staff." But Mr. McNair never assaulted any of USP Lee staff. At the DHO hearing on the merits of the incident report, Mr. McNair's 224-incident was reduced to a 307-incident for failure to obey an order. The outcome of this hearing confirms that Mr. McNair did not assault any staff at USP Lee.

81.     Mr. McNair spent a total of 40 days in the SHU due to the false 224-incident report that certain Defendants fabricated to justify their use of force against Mr. McNair. Mr. McNair lost fourteen days of "good time" credit as well.

82.     Mr. McNair has been "emotionally changed" from the torture he suffered over approximately seventeen hours from September 4, 2023 to September 5, 2023. Mr. McNair now has a heightened sense of awareness all the time and fears being around correctional officers.

83.     While in the SHU, Mr. McNair was never provided any medical or psychological attention, despite submitting three formal requests for medical care to staff ("cop outs"). Over the course of his time in the SHU, Mr. McNair only saw Defendant Baker who came to the door of his cell when Mr. McNair asked her to come over. On three separate occasions, Mr. McNair showed Defendant Baker his scars and asked for medical attention. Defendant Baker only told him to "put in a cop out," and did not follow up regarding his visible injuries.

21

84.    Despite filing multiple formal requests for care or "cop outs," Mr. McNair never received medical attention for the injuries he suffered while being assaulted in the SHU.

**CAUSES OF ACTION**

<u>COUNT ONE</u>

*Violation of Plaintiff's Eighth Amendment Rights (Against Defendant Gayheart, Defendant Smith, Defendant Gilmer, Defendant Smallwood, Defendant Glass, and Doe Defendants 1–5)*

85.    Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1-84 above.

86.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."

87.    As outlined above, on September 4, 2023 through September 5, 2023, Mr. McNair was brutally beaten multiple times, and cut his hair without justification and for the very purpose of causing harm, by Defendant Gayheart, Defendant Smith, Defendant Gilmer, Defendant Smallwood, Defendant Glass, and Doe Defendants 1–5 while being held in restraints, in violation of explicit BOP policies and the Eighth Amendment.

88.    Mr. McNair sustained severe physical injuries, including multiple bruises, lacerations, and contusions, as well as mental anguish, as a result of these Defendants' assault on September 4, 2023 through September 5, 2023.

89.    As a direct, foreseeable, and proximate result of these Defendants' deliberate indifferences to Mr. McNair's health and safety in violation of his Eighth Amendment rights on September 4, 2023 through September 5, 2023, Mr. McNair has suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages. Additionally, as a result of these Defendants' egregious, intentional, and reckless conduct in conscious disregard

22

for Mr. McNair's safety, as well as their pattern and practice of repeatedly violating Mr. McNair's

Eighth Amendment rights, Mr. McNair is entitled to punitive damages, as well as such other

appropriate damages and relief permitted by law, all in an amount to be determined at trial.

COUNT TWO

*Violation of Plaintiff's Eighth Amendment Rights (Against Defendant Streeval, Defendant Parsons, Defendant Hamilton, Defendant Bowles, Defendant Scott, Defendant Caudill, and Defendant Capriles-Mercado)*

90.    Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1-89 above.

91.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." This includes the right to be protected from known and substantial risks of serious harm.

92.    As outlined above, on September 4, 2023 through September 5, 2023, Mr. McNair was brutally beaten multiple times, without justification by Defendant Gayheart, Defendant Smith, Defendant Gilmer, Defendant Smallwood, Defendant Glass, and Doe Defendants 1–5 while being held in restraints, in violation of explicit BOP policies and the Eighth Amendment.

93.    Defendant Streeval, Defendant Parsons, Defendant Hamilton, Defendant Bowles, Defendant Scott, Defendant Caudill, and Defendant Capriles-Mercado did not actively participate in Mr. McNair's abuse on September 4, 2023 through September 5, 2023, but also violated Mr. McNair's Eighth Amendment rights by disregarding and failing to protect him from the risk of known, unnecessary, and gratuitous force, deliberately indifferent to Mr. McNair's health and safety.

94.    Mr. McNair suffered severe physical injuries, including multiple bruises, lacerations, and contusions, as well as mental anguish, as a result of the aforementioned Defendants' assault and the acquiescence of Defendant Streeval, Defendant Parsons, Defendant

23

Hamilton, Defendant Bowles, Defendant Scott, Defendant Caudill, and Defendant Capriles-Mercado on September 4, 2023 and September 5, 2023.

95.     As a direct, foreseeable, and proximate result of the aforementioned Defendants' deliberate indifference to Mr. McNair's health and safety, in violation of his Eighth Amendment rights on September 4, 2023 through September 5, 2023, Mr. McNair has suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages. Additionally, as a result of the aforementioned Defendants' egregious, intentional, and reckless conduct in deliberate indifference to Mr. McNair's safety, as well as their pattern and practice of repeatedly violating Mr. McNair's Eighth Amendment rights, Mr. McNair is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

COUNT THREE

*Violation of Plaintiff's Eighth Amendment Rights (Against Defendant Scott, Defendant Caudill, Defendant Capriles-Mercado, and Defendant Baker)*

96.     Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1-95 above.

97.     The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." This includes the right of residents in federal prison to receive adequate medical care.

98.     As outlined above, on September 4, 2023 through September 5, 2023, Mr. McNair was brutally beaten multiple times, without justification by Defendant Gayheart, Defendant Smith, Defendant Gilmer, Defendant Smallwood, Defendant Glass, and Doe Defendants 1–5 while being held in restraints, in violation of explicit BOP policies and the Eighth Amendment. When he sought medical assistance for his injuries sustained in this assault, he was ignored. Worse,

24

Defendants collaborated in making a false record to conceal his abuse and resulting injuries and to withhold medical treatment for severe injuries that included head and neck trauma and severe lacerations and bruising.

99.     Mr. McNair sustained extensive physical and mental injuries as a result of the aforementioned Defendants' assault on September 4, 2023 and September 5, 2023. Despite Mr. McNair's repeated requests, Defendants Scott, Caudill, Capriles-Mercado, and Baker failed to provide any medical care whatsoever for these injuries, leaving Mr. McNair in excruciating physical and psychological pain for a period of several weeks and with permanent scars.

100.    As a direct, foreseeable, and proximate result of the aforementioned Defendants' deliberate indifference to Mr. McNair's serious medical needs, Mr. McNair has suffered unnecessary and wanton infliction or pain in violation of the Eighth Amendment. And as a result, he is entitled to damages, including, without limitation, incidental, actual, consequential, and compensatory damages. Additionally, as a result of the aforementioned Defendants' egregious, intentional, and reckless conduct in conscious disregard for Mr. McNair's safety, as well as their pattern and practice of repeatedly violating Mr. McNair's Eighth Amendment rights, Mr. McNair is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

COUNT FOUR

*Assault and Battery Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

101.    Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraph 1-100 above.

102.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts, including intentional torts arising out of assault, battery, false

25

imprisonment, false arrest, abuse of process, and malicious prosecution, where the conduct at issue is premised on the acts or omissions of investigative or law enforcement officers of the United States.

103.    Under Virginia law, assault is established by: (1) an act intended to cause either harmful or offensive contact with another person, or (2) apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery. Battery is an unwanted touching which is neither consented to, nor excused, nor justified.

104.    As outlined above, on or around September 4, 2023 through September 5, 2023, Defendant Gayheart, Defendant Smith, Defendant Gilmer, Defendant Smallwood, Defendant Glass, and Doe Defendants 1–5, repeatedly touched Mr. McNair in a vicious, violent, rude, insulting, brutal, unwanted, and offensive manner, thereby causing Mr. McNair significant harm. Beyond mere touching, Defendant Gayheart, Defendant Smith, Defendant Gilmer, Defendant Smallwood, Defendant Glass, and Doe Defendants 1–5, on several occasions relevant to this Complaint, without provocation or justification, slammed Mr. McNair to the ground, placed him in excessively tightened ambulatory restraints, which was unwarranted; punched him repeatedly with closed fists in his face and torso; kicked Mr. McNair across his entire body, including his groin area; slammed him into the wall with a riot shield and used the shield to smash the back of his knees; used their hands to repeatedly karate chop Mr. McNair in the throat, and used scissors to cut dreadlocks out of Mr. McNair's hair.

105.    At times, the assault and battery against Mr. McNair occurred while he was wearing little clothing, causing severe and lasting injuries to his body.

106.    These touchings by Defendant Gayheart, Defendant Smith, Defendant Gilmer, Defendant Smallwood, Defendant Glass, and Doe Defendants 1–5 were unsolicited by

26

Mr. McNair, unwanted, and wholly inappropriate. The touchings were neither consented to, excused, nor justified. Furthermore, these Defendants engaged in acts, including berating and threatening Mr. McNair, and using derogatory remarks such as "nigger" against him, intending to create a reasonable apprehension of immediate, unwanted, and offensive touching of Mr. McNair.

107.    During the tortious conduct committed by Defendant Gayheart, Defendant Smith, Defendant Gilmer, Defendant Smallwood, Defendant Glass, and Doe Defendants 1–5 against Mr. McNair, each of these officers was acting within the scope of their employment duties as officers and agents of the federal government, and therefore, such conduct is imputable to Defendant United States of America.

108.    The actions by these officers were malicious, intentional, and amounted to extreme and outrageous conduct. As a proximate result of such conduct, Mr. McNair has suffered various bruises and contusions, abrasions on his wrists, ankles, and stomach that left permanent scarring, ongoing tingling in his left wrist, an inability to talk or swallow as usual, an inability to participate in physical activity despite previously exercising every day, and emotional pain and suffering for which the United States of America is liable.

COUNT FIVE

*Negligence Pursuant to the Federal Tort Claims Act 28 U.S.C. §§ 1346(b), 2671–80 (1946))*
*(Against Defendant United States of America)*

109.    Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1-108 above.

110.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

111.    Under Virginia law a negligence claim is established by: (1) the existence of a duty

27

of care; (2) breach of that duty; (3) legal causation; and (4) damages.

112.     The aforementioned officers, in the exercise of reasonable care, and pursuant to their authority and responsibilities as officials, employees, and/or agents of the United States of America, had a duty to keep Mr. McNair safe, and breached that duty by repeatedly grabbing, striking, kicking, restraining, and otherwise torturing Mr. McNair, and failing to protect Mr. McNair from that conduct.  These officers knew that their failure to uphold this duty placed Mr. McNair at an unreasonable risk of physical and mental injury.

113.     Defendant Bowles, Defendant Parsons, and Defendant Hamilton in their capacity as and pursuant to their authority and responsibilities as officials, employees, and/or agents of the United States of America, breached their duties by failing to intervene regarding the use of restraints and unjustified force and abuse, and they did so deliberately or carelessly, without proper regard to the risk of harm to Mr. McNair.

114.     As a direct and proximate result of the negligence and carelessness of these officers, Mr. McNair has suffered extreme physical, emotional, and mental distress.  As a direct and proximate result of these acts or omissions, Mr. McNair has suffered injuries for which he seeks compensatory and actual damages against the United States.

COUNT SIX

*Medical Malpractice Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

115.     Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1-114 above.

116.     The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

28

117.    Virginia law recognizes medical malpractice claims where a plaintiff establishes that a defendant violated the applicable standard of care and, therefore, was negligent, and that the defendant's negligent acts were the proximate cause of injury or death.

118.    Defendant Scott, Defendant Caudill, and Defendant Capriles-Mercado in their capacity and pursuant to their authority and responsibilities as medical practitioners and official, employees and/or agents of the United States of America, owed Plaintiff a duty to render medical care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances.

119.    Defendant Scott, Defendant Caudill, and Defendant Capriles-Mercado breached their duty of care by failing to ensure that Mr. McNair received from them reasonable care, skill, or knowledge ordinarily used under similar circumstances incident to his medical treatment when they observed him, bloody, weak and battered, immediately after and during the time when he was being physically assaulted and battered, and failed to inquire of his health, and performed only a perfunctory assessment of his injuries.

120.    As a proximate and causal result of Defendant Scott, Defendant Caudill, and Defendant Capriles-Mercado's failure to provide any medical care, Mr. McNair has endured physical, mental, and emotional pain and suffering for which the United States of America is liable.

## RELIEF SOUGHT

A.    Plaintiff seeks to be fully and fairly compensated for his injuries, pain, suffering, emotional, and mental distress to the fullest extent permitted under federal law.

B.    Plaintiff requests $10,000,000 in compensatory damages from Defendant.

C.    Plaintiff requests $5,000,000 in punitive Damages from Defendants.

D.    Plaintiff requests pre-judgment interest and post-judgment interest, together with an award of fees incurred in this case (including attorneys' fees), expenses, disbursements, and

29

costs arising from this action; and

  E.  Plaintiff requests any and all other relief this Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all counts so triable.


Dated: July 17, 2024        Respectfully submitted,

                   [Signatures on the following page]

/s/ W. Hunter Winstead
**W. Hunter Winstead**
Virginia Bar Number: 66770
December L. Huddleston
(*pro hac vice* forthcoming)
William H. Swain
(*pro hac vice* forthcoming)
Gilbert LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Telephone:   (202) 772-2301
Email: WinsteadH@GilbertLegal.com
Email: HuddlestonD@GilbertLegal.com
Email: SwainW@GilbertLegal.com

/s/ Kristin L. McGough
Kristin L. McGough
(*pro hac vice* forthcoming)
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
700 14th Street, NW
Suite 400
Washington, DC 20005
Telephone:   (202) 319-1000
Email: Kristin_McGough@washlaw.org

*Counsel for Plaintiff Dentavia McNair*

31